UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL R SCHNEIDER,

        Plaintiff,

        v.

Case No. 16-cv-0013-bhl

UNITED STATES POSTAL SERVICE,
MEGAN J BRENNAN,

        Defendants.

## DECISION AND ORDER

      Plaintiff Daniel Schneider, a former United States Postal Service (USPS) employee, suffers from major depression and anxiety disorder. In this long-pending case, he brings four claims against the USPS, all related to his former employer's alleged mishandling of his mental health needs. Schneider asserts: (1) failure-to-accommodate, (2) retaliation, and (3) constructive discharge claims under the Rehabilitation Act of 1973, and (4) a claim for improper disclosure under the Privacy Act of 1974. The USPS denies any liability. Both parties have moved for summary judgment. Because the record is insufficient to permit a reasonable jury to find in Schneider's favor on his failure-to-accommodate, constructive discharge, and improper disclosure claims, the Court will grant Defendants' motion and deny Schneider's motion as to those claims. Questions of fact persist with respect to Schneider's retaliation claim, however, so both sides' motions will be denied on that count.

## FACTUAL BACKGROUND[1]

      Daniel R. Schneider started working for the United States Postal Service in July 1988 as a city carrier. (ECF No. 35 at 1.) From August 2009 to November 2011, he worked as a mailing

---

[1] These facts are drawn from admitted allegations in the complaint (ECF No. 1) as well as the proposed statements of undisputed facts (and responses) filed by the parties. (ECF Nos. 28, 35, 37, 43, & 45.) Disputed facts are viewed in the light most favorable to the non-moving party.

solutions specialist, and, from November 2011 until his disability retirement in 2013, he was a supervisor of customer service. (*Id*.)

In 2001, a doctor diagnosed Schneider with major depression and anxiety disorder and placed him on medication. (ECF No. 1 at 3.) Schneider claims his symptoms peaked in response to work and home-related stressors and, at their most debilitating, rendered him entirely unable to work. (*Id*.) Though his depression waxed and waned over the years, Schneider's mental health eroded substantially starting in 2010. (*Id*. at 4.) Over a period of several months, he was twice granted leave under the Family and Medical Leave Act to address his depression, first in September of 2010 and again in February 2011. (ECF No. 35 at 2-3.) During this same period, Schneider received two warning letters for inadequate performance. (ECF No. 43 at 2-3.)

On October 3, 2011, with his depression still not under control, Schneider asked to switch to a less stressful position in postal service operations. (ECF No. 35 at 4.) The following month, he voluntarily accepted a demotion to the role of supervisor of customer service at the Franklin, Wisconsin post office, where Maria Robinson served as his direct manager and Postmaster Susan Lierman was his supervisor. (*Id*. at 5, 6, 8.) Schneider reports that he did not intend to work in Franklin for more than a year because it required a daily 80-mile commute to and from his home near Madison, Wisconsin. (ECF No. 1 at 5; ECF No. 43 at 4-5.) This proved prescient, because, although his new job was less demanding, the long commute exacerbated his sleep difficulties and depression. (ECF No. 1 at 5.) Despite these issues, the record does not show that Schneider ever provided the USPS with a doctor's note or other medical documentation indicating a need to work closer to home. (ECF No. 43 at 5.)

In January 2012, just a few months after transferring, Schneider learned of vacant, unposted supervisor positions in Madison. (ECF No. 35 at 6.) He contacted Acting Madison Postmaster Diane LeVeque, seeking a lateral transfer to one of those positions as a way to accommodate his depression. (*Id*.) Unfortunately for Schneider, the vacant supervisor positions were being held open for employees impacted by impending postal facility consolidations, (ECF No. 38-11 at 10; ECF No. 38-6 at 21:4-8 & 116:15-22), and Schneider was not one of those employees. He nevertheless pursued a transfer and, during an impromptu phone interview in February 2012, explained his condition and reason for seeking a move back to Madison. (ECF No. 42-1 at 9.) LeVeque ultimately denied his request. (ECF No. 43 at 8.)

After missing out on the supervisor transfers, Schneider began applying for other positions that were posted and based in Madison. (ECF No. 1 at 5-11.) On each occasion, USPS supervisor Brian DeValk rejected Schneider's application. In March 2012, Schneider applied for two openings in Madison, one as a shipping solutions specialist and the other a mailing solutions specialist. (*Id*. at 5.) According to DeValk, Schneider lacked two of the necessary Knowledge, Skills, and Abilities (KSA) requirements for the shipping specialist position, which instead went to Steven Placek, a candidate who met all the KSA requirements. (ECF No. 43 at 11-14.) DeValk also rejected Schneider for the mailing solutions specialist position. This rejection was allegedly based on missing KSAs and Schneider's disciplinary and performance history. (*Id*. at 16-17.) On April 4, 2012, Schneider applied for a business solutions specialist position in Madison. (ECF No. 1 at 6.) An independent review board studied Schneider's qualifications and recommended him for an interview, but, in mid-June 2012, DeValk again rejected Schneider's application, this time based on unsatisfactory interview answers and his disciplinary and performance history. (ECF No. 43 at 17, 19-22.)

On June 13, 2012, while his business solutions application was still under consideration, Schneider filed an EEO case alleging failure to accommodate and retaliation. (ECF No. 35 at 9.) Two weeks later, Schneider finally presented his doctor's work restrictions to Postmaster Lierman and formally requested an accommodation. (*Id*. at 9-10.) Lierman referred him to the agency's employee assistance program. (*Id*. at 10.) Then, on August 7, 2012, Lierman met with Schneider and discussed his proposed accommodations, including his formal requests for family medical leave to allow for medical appointments; time off during depressive episodes; and, based on his health provider's restrictions, eight-hour days, two consecutive days off per week, and a regular schedule. (ECF No. 1 at 7.) As Lierman explained in an August 8 email to Nurse Judith Yerdon, USPS granted these requested accommodations. (ECF No. 27-2 at 39.)

Around this same time, Schneider applied for yet another business solutions specialist position in Madison. (ECF No. 43 at 23.) On September 13, 2012, while that application was pending, Schneider claims Lierman called him into her office, told him no one else at USPS was going to hire him, and referred to him as a "piece of shit." (ECF No. 35 at 17.) Schneider's description of Lierman's vulgarity during this meeting is consistent with a series of offensive emails unearthed in discovery. In email chains dating from 2011-2013, Lierman, Robinson, and DeValk made a litany of derogatory comments about Schneider to various other postal employees.

(ECF No. 35.) The remarks ranged from the relatively tame: "I can't stand this guy," (*Id.* at 30), to the crude: "he's f**king nuts." (*Id.* at 19.) Schneider was not a party to any of these threads and, other than the statements in Lierman's office, none of these three USPS employees' comments were made to him directly. Ultimately, the USPS included Schneider among three candidates interviewed for the business solutions position. (ECF No. 43 at 23.) But DeValk again rejected Schneider's candidacy and instead hired Tim Peterson, who, according to DeValk, had the highest cumulative application and interview scores. (ECF No. 46 at 1-3.)

Schneider later submitted a fifth and final job application to DeValk, seeking a mailing solutions specialist position in Madison. (ECF No. 43 at 27.) Schneider was one of two candidates interviewed for the role, but on January 17, 2013, DeValk hired the other applicant, Mary Zientara, because, according to DeValk, she had the higher interview scores and no negative performance history. (*Id.* at 27-29.)

Between September 2012 and May 2013, Schneider contacted various USPS higher ups, asking to get closer to home and requesting additional accommodations beyond those granted to him in August of 2012. (ECF No. 35 at 28-32.) When nothing came of those inquiries, Schneider chose to pursue retirement. On May 24, 2013, the Human Resources Shared Service Center (HRSSC) received Schneider's disability retirement application. (*Id.* at 32.) On October 7, 2013, USPS closed Schneider's reasonable accommodation request after his doctor designated him unfit to work at all. (*Id.* at 38.) On October 25, 2013, Schneider reported to an EEO investigator: "I was forced into an early disability retirement because of the UPS failure to provide a reasonable accommodation and retaliation for enforcing my rights under FMLA and ADA." (*Id.* at 39.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

# ANALYSIS

Schneider brings four claims against the USPS: failure to accommodate, retaliation, constructive discharge, and improper disclosure. The first three arise under the Rehabilitation Act of 1973 and the fourth is brought pursuant to the Privacy Act of 1974. Based on the summary judgment record, a reasonable jury could find for Schneider only on the retaliation claim. Accordingly, Schneider's motion for summary judgment will be denied in its entirety, and the USPS's motion will be granted in part and denied in part, with only Schneider's retaliation claim remaining for trial.

## I. Schneider Cannot Establish a Prima Facie Case on His Failure-to-Accommodate Claim.

Schneider bases his failure-to-accommodate claim on the USPS's failure to approve his January 2012 request for a lateral transfer to Madison. (ECF No. 29 at 6.) To establish a prima facie case under the Rehabilitation Act, Schneider must show: (1) he is a qualified individual with a disability; (2) the USPS was aware of his disability; and (3) the USPS failed to reasonably accommodate his disability. *See Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). While Schneider has marshalled sufficient evidence to create jury issues on the first two elements, he has failed to so on the third. Indeed, despite ample time for discovery, Schneider has not sufficiently identified a reasonable accommodation that the USPS denied him. This dooms his failure-to-accommodate claim.

### A. A Reasonable Jury Could Find that Schneider is a Qualified Individual with a Disability and that the USPS Was Aware of His Disability.

So long as it substantially limits one or more major life activities, 29 C.F.R. §1630.2(g), depression can constitute a disability under the Rehabilitation Act. *See Ogborn v. United Food & Com. Workers Union, Loc. No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (observing "[m]ajor depression can constitute a disability under the ADA").[2] Major life activities include working. 29 C.F.R. §1630.2(i)(1)(i). Over the years, Schneider's major depression marred both his job performance and attendance. (ECF No. 1 at 3.) Thus, Schneider easily provides sufficient evidence that his depression rendered him an individual with a disability.

---

[2] Title II of the ADA was modeled on the Rehabilitation Act, which means that standards applicable to one are applicable to the other. *Washington v. Indiana High School Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n. 6 (7th Cir. 1999).

Whether Schneider is a "qualified individual" with a disability is a closer question. Under the applicable two-part test, Schneider must show both that he satisfied the prerequisites for his position and could perform the position's essential functions, with or without a reasonable accommodation. *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 285 (7th Cir. 2015). Given his 20 years of experience at the USPS, a jury could readily find that Schneider satisfied the prerequisites for the supervisor positions in Madison. But his ability to perform the essential functions of that job, with or without an accommodation, is less clear.

The Seventh Circuit has confirmed that "[s]potty attendance by itself may show lack of qualification." *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). Calling Schneider's attendance "spotty" would be generous. From July 2012 to June 2013, he reported for work on only 71 out of a possible 250 workdays, a woeful 28% attendance rate. (ECF No. 37 at 20-21.) In addition, between 2010 and 2012, he received multiple warning letters for unproductivity and insubordination. (ECF No. 28 at 2, 7, 10, 16-19, & 21.) But Schneider's disability is depression, which is not akin to a permanent physical limitation. *See Majors v. General Elec. Co.*, 714 F.3d 527 (7th Cir. 2013) (holding that an employee who could not physically lift 20 pounds could not perform the essential functions of her job because her only proposed accommodation was to have someone else lift the weight for her). At the risk of expressing obvious tautology, an employee who cannot physically lift 20 pounds cannot physically lift 20 pounds. This is true regardless of how supportive or accommodating her employer might be. By contrast, the interplay between employer and employee can impact how the specter of depression manifests. Failure to engage in an interactive process cannot make an employee who cannot physically lift 20 pounds any worse at lifting the weight, but it could exacerbate a depressed employee's depression. So even if the disabilities' practical effects are the same—neither employee can lift 20 pounds—the depressed employee stands on different ground because his inability to lift the weight may have been caused, and may be ameliorated, by his employer's behavior. It is unclear whether Schneider's performance issues followed ipso facto from his depression or if they were the result of the USPS's failure to accommodate him. Because the record indicates Schneider did satisfactorily perform the essential functions of his job prior to 2010, the "essential functions" issue is a triable question of fact. *See Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 599-600 (7th Cir. 1998) (holding that a jury was entitled to find that "the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather

than the underlying impairment") (quoting *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995)). At summary judgment, that is enough to survive.

The record also supports Schneider's contention that the USPS was aware of his disability. Major depression is not a disability that readily announces itself. *See Bultemeyer v. Fort Wayne Cmty. Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("In a case involving an employee with mental illness . . . [i]t is crucial that the employer be aware of the difficulties[.]"); *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("an employer cannot be liable under the ADA . . . when it indisputably had no knowledge of the disability"). When battling invisible diseases and disorders, it is incumbent on the employee to inform the employer of his imperceptible limitations. The employee may not remain silent and then sue the employer for failing to intuit a disability out of thin air. *See Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 898 (D.C. Cir. 1998).

While USPS alleges that Schneider failed to make LeVeque aware of his disability, the record paints a very different picture. Far from holding his condition in confidence, Schneider swears he informed LeVeque of his depression and that his transfer application was meant as a request for accommodation. (ECF No. 42-1 at 9.) He also insists this occurred *before* LeVeque denied the proposed Madison transfer. (*Id.*) While LeVeque rejects this fact pattern, (ECF No. 35 at 6), as she is certainly entitled, the veracity of her denial is not for the Court to decide at summary judgment. The record contains sufficient evidence for a jury to find that she was well aware of Schneider's depression when she rejected his transfer request. Therefore, LeVeque cannot prevail at summary judgment on lack of knowledge grounds.

**B. Schneider's Failure-to-Accommodate Claim Fails Because He Has Not Identified Any Actually Available Accommodations that USPS Denied Him.**

When a qualified individual with a disability makes his or her employer aware of the disability, the employer has a duty to make reasonable accommodations for the disability. *Dey v. Milwaukee Forge*, 957 F. Supp. 1043, 1050 (E.D. Wis. 1996) (citing *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996)). A "reasonable accommodation" may include measures like "job restructuring; part-time or modified work schedules; [or] reassignment to a vacant position. . . ." 29 C.F.R. §1630.2(o)(2)(ii). The process of identifying and implementing an accommodation begins with the employee "informing his employer of his disability" which triggers the employer's duty. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) (quoting *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir.1996)). The

employer must then "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). Both employee and employer have obligations to engage in this process in good faith, and an employer who acts in bad faith or halfheartedly engages in the interactive process may be held liable. *Beck*, 75 F.3d at 1135. Moreover, even if an employee's proposed accommodation would be impractical or ineffective, the employer has the affirmative obligation to continue to strive for a workable accommodation. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).

The USPS asserts it is entitled to summary judgment because no jury could find that it failed to engage in the required interactive process. It cites evidence that it engaged with Schneider and acceded to at least some of his accommodation requests. In particular, the USPS notes that Lierman implemented Schneider's doctor's recommended changes to his schedule following an August 2012 meeting. (ECF No. 27-2 at 39.) This responsiveness, while legally appropriate, does not vitiate all potential liability arising from LeVeque's actions. An employer has a duty to "engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." *Hendricks-Robinson*, 154 F.3d at 693. The record does not establish that LeVeque did this. She denied Schneider's proposed accommodation and, at least allegedly, took no further action to identify an alternative, reasonable way to accommodate his disability. The hypothetical trier of fact could certainly find that behavior inconsistent with a good faith, interactive process. This factual issue does not end the matter, however.

The USPS's better summary judgment argument is that, even if it failed to engage fully with Schneider, the only accommodations he has identified were transfers to positions not actually "vacant" or available to him. Under Seventh Circuit law, this is a winning argument. The Court of Appeals has emphasized that a breakdown of the interactive process is not, by itself, enough to establish liability on a failure-to-accommodate claim; such breakdowns must be evaluated under a no-harm-no-foul principle. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000) ("[t]he interactive process the ADA foresees is not an end in itself") (quoting *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997)). In *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001), the Court of Appeals explained that courts must "first look at whether there is a

genuine issue of material fact regarding the availability of a vacant position to accommodate" the plaintiff. "If there were such a position, only then do we consider whether the failure to provide that accommodation was due to a breakdown in the interactive process." *Id*. Further, a reasonable accommodation does not mean "an employer is required to fill a position which, based on a reason wholly independent of the employee's disability, it had chosen not to fill. Such a position is not 'vacant.'" *Id*. at 841. This is where Schneider's claim fails.

Schneider has not identified any actual accommodations that were denied him. With respect to job transfers, the record shows there were no true "vacancies" for Schneider in Madison. (ECF No. 44 at 3.) The open Madison positions were being held for employees impacted by impending postal facility consolidations. (ECF No. 39 at 7-8.) Schneider was not impacted by those consolidations and, as a result, the USPS was under no obligation to transfer him. Unable to rely on these openings, Schneider is left to claim generally that the alleged breakdown in the interactive process denied him the opportunity to fully explore a workable accommodation. (ECF No. 41 at 7.) Maybe so, but, at summary judgment, it is his burden to identify one. *See Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("'summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'") (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A generic assertion that *some* vacancy *might* have been found *somewhere* is insufficient at this stage in the game. Surely after years of litigation and extensive discovery, Schneider would be capable of pointing to a possible reasonable accommodation if one existed. His briefs, however, only vaguely argue that he did not have the opportunity to fully explore the breadth of possible accommodations. (ECF No. 41 at 4.) If this is the extent of his evidence, no reasonable factfinder could determine that the breakdown in the interactive process led to a subsequent failure to accommodate. Accordingly, the USPS is entitled to summary judgment on Schneider's failure-to-accommodate claim.

## II. Schneider Has Sufficient Evidence to Raise a Jury Issue on His Retaliation Claim.

Schneider's second claim is that the USPS retaliated against him for protected activity, both when LeVeque denied his transfer request and when DeValk rejected his five job applications for positions in Madison. "Both the FMLA and the ADA prohibit employers from retaliating against employees who assert their statutory rights." *Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018). "Retaliation claims under the FMLA and ADA require three familiar

elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Id.* at 901 (citing *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)).

At summary judgment, the Court employs the burden-shifting framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first come forward with sufficient evidence to create a prima facie case on all three elements of his claim, including causation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff succeeds, "the burden shift[s] to the defendant to provide nonretaliatory explanations for its actions." *Smart v. Ball State University*, 89 F.3d 437, 440 (7th Cir. 1996). Once the employer does so, the burden then returns to the plaintiff to show that the proffered explanation is pretextual. *Id.* at 439. Because Schneider has gathered sufficient evidence to carry his parts in this burden-shifting paradigm, his retaliation claim against DeValk will survive summary judgment.

### A. Schneider Has Made a Prima Facie Showing on His Retaliation Claim.

The record supports Schneider's claim on the first element of his retaliation claim—that he engaged in statutorily protected activity. Taking FMLA leave because of medical ailments constitutes statutorily protected activity. *See Freelain*, 888 F.3d at 901. The same is true for making an EEO filing. *See Anderson v. Donahoe*, 699 F.3d 989, 995 (7th Cir. 2012) (citing *Coleman v. Donahoe*, 667 F.3d 835, 859-60 (7th Cir. 2012)). While working for the USPS, Schneider took FMLA leave and filed an EEO complaint. Thus, he engaged in statutorily protected activity during his tenure.

Schneider has also produced evidence from which a jury could find that he suffered an adverse employment action. "In the retaliation context, determining whether an action is materially adverse means inquiring whether it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). While the denial of a lateral transfer is not a materially adverse employment action, *Johnson*, 325 F.3d at 900, the denial of a promotion opportunity is. *Id.* ("[D]enial of an opportunity [for a promotion], unlike the mere denial of a lateral transfer, constitutes a materially adverse employment action.") (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465-66 (7th Cir. 2002)). Under this caselaw, some of the job rejections Schneider received cannot qualify as adverse employment actions. More

specifically, LeVeque's decision to deny Schneider's transfer request and DeValk's decision not to hire him for the business solutions specialist positions were not adverse employment actions because they were denials of mere lateral transfers. (ECF No. 39 at 8.) On the other hand, moving Schneider to the shipping solution specialist or mailing solutions specialist positions would have been tantamount to a promotion. (*Id.*) Therefore, DeValk's decisions not to hire Schneider for those jobs could constitute adverse employment actions under Seventh Circuit law.

Schneider has also satisfied the causal element of his prima facie case. For a claim of retaliation, the plaintiff will survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Baines v. Walgreen Co.*, 863 F.3d 656, 661-62 (7th Cir. 2017) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013)) ("'If a plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate.'").

As an initial matter, "[a]n employer must have actual knowledge of the employee's protected activity to state a claim for retaliation." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). The parties spend significant portions of their briefs debating what Schneider told DeValk and when. But whether DeValk was more a confidant to whom Schneider entrusted every stray reverie or an unwilling sounding board who suffered Schneider's communications through gritted teeth is ultimately irrelevant. There is ample evidence that DeValk was aware of Schneider's protected activity. In an email sent to DeValk on November 23, 2010, Schneider specifically referenced his use of FMLA leave and his mental health struggles. (ECF No. 35 at 2.) And at the very latest, DeValk knew of Schneider's EEO complaint in September 2012, before denying him the second mailing solutions specialist role. (*Id.* at 18.)

With knowledge established, the Court must now consider whether Schneider's evidence is sufficient to permit a reasonable factfinder to conclude that his protected activity caused the adverse employment actions at issue. Direct evidence of this causal connection—akin to the employer announcing, "I ate the last cookie in the jar"—is exceedingly rare, and indeed, Schneider does not have any. *Baines*, 863 F.3d at 661. What he does have, however, is an array of

circumstantial evidence, the equivalent of the trail of cookie crumbs leading from the jar back to the employer's office.

Schneider first points to the derogatory way DeValk referenced him in email threads. (ECF No. 29 at 22.) In emails sent on January 4-5, 2011, DeValk called Schneider "F'ing crazy" and "the reason God made Bombay Saphire [sic]." (ECF No. 27-2 at 99.) On April 27, 2011, DeValk asked a coworker of Schneider, "Still think he's normal, Buzz?" (*Id*. at 108.) When the coworker responded that he would not put up with Schneider, DeValk agreed, "You got that right." (*Id.*) On May 16, 2011, DeValk forward a copy of a private email exchange between he and Schneider to other postal employees and referred to Schneider as "Walter Mitty." (*Id*. at 104.)

Schneider next highlights a conversation DeValk had with Lierman around September 18, 2011 and emails DeValk and Lierman exchanged in early January 2013. (ECF No. 29 at 22-23.) During the September conversation, DeValk inquired about Schneider's FMLA leave, mocked and revealed Schneider's confidential EEO complaint, and consistently derided Schneider because of his disability. (ECF No. 27-2 at 134-35.) In the January emails, DeValk probed deeper into Schneider's use of FMLA leave shortly before his interview for the second mailing solutions specialist position. (*Id.* at 154-55.)

Schneider also emphasizes June 2012 emails between DeValk and his supervisor Kevin Helmer. (ECF No. 29 at 22.) On June 22, 2012, right after DeValk rejected his application for the first business solutions specialist role, Schneider emailed Helmer and informed him that his 2010-11 discipline and performance issues were attributable to mental illness. (ECF No. 27-2 at 141-42.) In response, Helmer emailed DeValk and warned him to "Be careful." (*Id.* at 141.) DeValk replied, "I was very careful to keep it to his lack of performance," a statement that might imply that there were additional, unspoken reasons that DeValk needed to avoid. (*Id.*)

Finally, Schneider points to an avalanche of emails in which various USPS higher ups disseminated his private medical information and ridiculed him for his disability. (ECF No. 29 at 23-24.) Lierman alone referred to Schneider as: "a head case" (ECF No. 35 at 11), a "little baby" (*Id.* at 16), a "piece of shit" (*Id.* at 17), "f**king nuts" (*Id.* at 19 & 35), "the loser" (*Id.* at 21), a "dumbass" (*Id.*), a "nut case" (*Id.* at 35), "seriously unstable" (*Id.*), and a "crazy dude." (*Id.*) She also shared his confidential medical information with multiple colleagues. (*Id.* at 18-21.) And in a May 28, 2013 email, she confirmed that her plan was to either force him to retire or fire him.

(ECF No. 35 at 33.) Maria Robinson similarly disclosed Schneider's private medical information to colleagues. (*Id.* at 30.) And she also mocked his disability in emails. (*Id.*)

While some of these statements may qualify as "stray remarks," they are sufficient to create a jury issue on causation. The Seventh Circuit has confirmed that "[a] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 935 (7th Cir. 2020) (citing *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 632 (7th Cir. 1996)). And while remarks uttered by non-decisionmakers cannot singularly satisfy the plaintiff's burden in a retaliation case, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring), they "are evidence, which together with the other evidence in [a] case could lead a jury to conclude . . . that the [defendant] engaged in unlawful discrimination." *Emmel*, 95 F.3d at 632. "[C]ourts should not discard circumstantial evidence simply because it does not provide direct proof of unlawful intent." *Freelain*, 888 F.3d at 905. Considering the volume and offensive nature of his superiors' remarks, a reasonable factfinder could certainly conclude that Schneider's disability and exercise of his EEO rights was a motivating factor in DeValk's actions.

This is true even though DeValk stamped his employment decisions with legitimate, nondiscriminatory rationales based on a combination of poor past performance and insubordinate behavior. (ECF No. 43 at 11-12, 15-17, 28-29.) True, these explanations satisfy DeValk's burden to offer a legitimate, non-discriminatory rationale for his behavior. However, if the jury believes Schneider's evidence and testimony, it could properly find these rationales mere pretext. *See Ortiz*, 834 F.3d at 766 ("In the end a jury might not credit [Plaintiff's] evidence and could accept [Defendant's] explanations. But given the conflict on material issues, a trial is necessary."). As with *Ortiz*, the conflicts on material issues necessitate a trial. Accordingly, the USPS's motion for summary judgment will be denied with respect to Schneider's retaliation claim.

### III.  Schneider Has Not Come Forward with Sufficient Evidence to Create a Jury Issue on His Constructive Discharge Claim.

Schneider's third claim is that although the USPS never actually terminated his employment, the agency's unendurable working conditions were tantamount to discharge based on discrimination. He argues that acts of incivility and harassment and an intentional failure to engage in the interactive accommodation process establish the elements of the claim. (ECF No. 41 at 13-17.) While the host of offensive comments USPS personnel made about Schneider in

emails (and allegedly in a single meeting with him) paint a negative picture of his employment conditions, Schneider's attempt to make out a claim faces several significant legal hurdles.

As a threshold matter, the Seventh Circuit has never conclusively determined that a "claim of constructive discharge stemming from a hostile work environment is cognizable under the ADA." *Sears, Roebuck & Co.*, 233 F.3d at 440. Because it makes no difference to the outcome, the Court will assume that such a claim is cognizable. But, even reading all the evidence in Schneider's favor, he cannot prove either form of constructive discharge recognized in this circuit.

The Seventh Circuit has identified two different forms of constructive discharge. *Chapin v. Fort Row Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The first when an employee resigns due to alleged discriminatory harassment (*Id*. at 679), the second "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). Under the second form, an employee need not "sit in the corridor while waiting for someone to say 'you have been fired,'" nor must they remain on the job when they are "relegated to menial tasks and the employer makes it clear that no better treatment can be hoped for." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004). Both forms mandate that the plaintiff demonstrate an unendurable work environment. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). This "requires evidence that quitting was the only way the plaintiff could extricate h[im]self from the intolerable conditions." *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001). This is a higher bar than a hostile work environment. *See Novak v. Nicholson*, 231 F. App'x 489, 493 (7th Cir. 2007). "Whether the plaintiff's work environment meets that standard is determined from the viewpoint of a reasonable employee." *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 537 (7th Cir. 1993). Thus, "unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)).

### A. Schneider Must Show Unendurable Working Conditions, Not Merely a Hostile Environment.

Schneider argues that his constructive discharge claim should be analyzed under a more lenient "hostile work environment" standard. (ECF No. 41 at 13.) He seizes upon language in a district court decision, *Suvada v. Gordon Flesch Co.*, No. 11 C 07892, 2013 WL 5166213 (N.D. Ill. Sept. 13, 2013), in which that court recognized a constructive discharge claim under the ADA

and purported to adopt the "more forgiving" hostile work environment standard. The *Suvada* Court held, "[i]n [ADA] cases, the employer has a heightened duty to engage the employee in the interactive process to identify a reasonable accommodation." *Id*. at *10. "Thus, when considering a constructive discharge claim brought under the ADA, the Court must evaluate the reasonableness of the employee's response with this heightened duty in mind." *Id*. "Because an employer must do more to see if an accommodation can be made for an employee with a disability, the standard for reasonableness must be correspondingly more forgiving for an employer bringing an ADA-based constructive discharge claim." *Id*.

*Suvada* is an eight-year-old, unreported district court case that explicitly decides a legal issue the Seventh Circuit has reserved. *Id*. In the intervening years, no Seventh Circuit panel has adopted the *Suvada* Court's reasoning, and no other district court has endorsed this part of its holding. This Court is not persuaded that *Suvada*'s proposed lighter standard for constructive discharge is correct and will instead apply the Seventh Circuit's clear holdings that a constructive discharge claim like Schneider's requires proof that his working conditions were truly unendurable.

### B. Schneider Did Not Suffer Discriminatory Harassment that Made His Working Conditions Unendurable.

The discriminatory harassment form of constructive discharge is only found in the most exceptional situations. *See Porter v. Erie Foods, Int'l Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (permitting a claim for constructive discharge when harassment involved repeated use of a noose and implied threats of violence); *Taylor v. W.&S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (finding constructive discharge where supervisor brandished a firearm and held it to the plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (finding constructive discharge where employee's HR manager repeatedly showed her racist pornographic pictures, told her she was hired to perform the sex act depicted in the pictures, and threatened to kill her). Employers can wade deep into the recesses of the uncouth without triggering liability. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877-78 (7th Cir. 1999) (holding that a co-worker saying "someone should take a dish and knock [Plaintiff] upside the head" did not establish constructive discharge); *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998) (finding boorish behavior like taking over employee's cubicle or constantly logging her off of her computer did not establish constructive discharge); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044,

1046 (7th Cir. 2000) (rejecting constructive discharge where a co-worker told Plaintiff to "[g]et the fuck out of the office before I pop a cap in your ass" and then began prancing around, derisively caricaturing African-Americans and using the N-word).

Schneider's work environment hardly reflected the whimsical camaraderie of *The Office*—his supervisor refused to speak with him for months—but it was equally far from the unendurable conditions necessary for a finding of constructive discharge under Seventh Circuit caselaw. True, Lierman did pull Schneider into her office, berate him, and call him a "piece of shit." (ECF No. 35 at 17.) But "[o]ne threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for [Schneider's] constructive discharge claim." *Chapin*, 621 F.3d at 679.

Nor can Schneider rest on his complaint that his workplace was made unendurable by a persistent stream of gossip-filled emails belittling him and questioning his medical condition. There is no evidence that Schneider had knowledge of those emails until *after the fact*. He was never copied on the email chains, and he only learned of them because of discovery in this case. After-acquired evidence that contradicts one's prior understanding of his social position may sour memories, but sour memories are not evidence of intolerable working conditions.

### C. The USPS Never Communicated to Schneider that He Would Be Terminated.

Schneider fares no better under the second form of constructive discharge. This second form does not obviate the need for the plaintiff to prove unendurable working conditions. *Id*. But rather than harassment, here the Court looks for situations where the "handwriting was on the wall" and the plaintiff quit "just ahead of the fall of the axe." *Id*. at 680 (quoting *Lindale*, 145 F.3d at 956); *see also Univ. of Chicago Hosps.*, 276 F.3d at 332 (allowing plaintiff to proceed with constructive discharge claim because she arrived at work to find her belongings packed and her office converted to storage space, which occurred shortly after a supervisor was terminated for refusing to fire the plaintiff); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 502 (7th Cir. 2010) (finding constructive discharge where both parties agreed that, after giving a pro-union speech, the plaintiff had only two choices: resignation or termination); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000) (holding "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable").

If USPS intended to inform Schneider of his imminent termination, they did a poor job of it. No reasonable person in Schneider's shoes would discern an impending resign-or-be-fired ultimatum where the employer has recently initiated the interactive accommodation process and continued to assign the employee the same duties he has borne for the past year. *See Chapin*, 621 F.3d at 680 (finding that reassurances of job security vitiated reasonable fear of imminent termination). While Lierman did declare that no one else at USPS was going to hire Schneider, (ECF No. 35 at 17), this proclamation related to Schneider's request for a transfer; it did not imply termination from his existing position. Moreover, this statement is materially distinct from the situation in *Hunt*, where the defendant mayor and other officials regularly pressured White police officers to resign so they could be replaced with younger Black candidates. *Hunt*, 219 F.3d at 652.

Schneider tries to resuscitate his claim, arguing that USPS's failure to accommodate amounted to a constructive discharge. Although not flatly prohibited under Seventh Circuit law, failure-to-accommodate constructive discharge claims require the plaintiff to show more than that he was "being denied reasonable accommodations at every turn." *Sears, Roebuck & Co.*, 233 F.3d at 441. Much to the contrary, in this case, several of Schneider's accommodations were accepted and implemented. (ECF No. 27-2 at 39.) To further torture an already-abused metaphor, if the USPS was wielding an axe, it was clearly still on the backswing. Schneider has not presented sufficient evidence to support a viable claim for constructive discharge.

IV. **Schneider Has No Claim Under the Privacy Act Because He Has Not Pleaded Special Damages.**

Schneider's final claim is for a violation of the Privacy Act of 1974. This claim can be more easily dispatched. The statute "serves to safeguard the public interest in informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals." *Ely v. Dep't of Just.*, 610 F. Supp. 942, 945 (N.D. Ill. 1985), *aff'd*, 792 F.2d 142 (7th Cir. 1986) (citing *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 548 (S.D.N.Y. 1980)). It prevents unauthorized disclosure of "any item, collection, or grouping of information about an individual that is maintained by an agency, including . . . medical history" if such disclosure contains identifying information. 5 U.S.C. §552a(a)(4). "The civil remedies provision of the Privacy Act provides that, for any 'intentional or willful' refusal or failure to comply with the Act, the United States shall be liable for 'actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person

entitled to recovery receive less than the sum of $1,000.'" *F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012) (quoting 5 U.S.C. §552a(g)(4)(A)). This provision "'parallels' the remedial scheme for the common-law torts of libel *per quod* and slander, under which plaintiffs can recover 'general damages,' but only if they prove 'special harm' (also known as 'special damages')." *Id*. at 295. "'Special damages' are limited to actual pecuniary loss, which must be specially pleaded and proved." *Id*. Presumed damages will never suffice. *Id*. at 300.

Schneider did not plead special damages in his complaint. (ECF No. 1 at 16-17.) In an apparent attempt to cure this defect, he advances two new damages theories for the first time in his reply brief. (ECF No. 41 at 17-18.) But this after-the-fact bootstrapping contravenes the Supreme Court's holding in *Cooper*. Having failed to plead special damages, he cannot remedy the defect in a last-minute amendment through his briefing. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (holding that a plaintiff "cannot amend his complaint 'through arguments in his brief to a motion for summary judgment'") (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)). Moreover, his last-ditch special damages theories would not carry the day had they been timely pled. Schneider first claims that the USPS's disclosures cost him two potential job transfers, theoretically depriving him of an increase in pay. (ECF No. 41 at 17-18.) But Schneider never alleges a particular loss. This kind of speculative, non-specific "increase in pay" would not satisfy the requirement for special damages in a libel *per quod* case. *Action Repair, Inc. v. ABC, Inc.*, 776 F.2d 143, 150 (7th Cir. 1985) (noting that a special damages statement was insufficient because it did not allege a basis for the blanket monetary figure presented). Because the Privacy Act's remedial scheme parallels that of libel *per quod*, *Cooper*, 566 U.S. at 296, Schneider's vague assertion of a lost increase in pay will not satisfy the requirement for special damages here either.

With nothing left to lose, Schneider tosses a desperate Hail Mary, claiming as his actual pecuniary loss the increased legal cost incurred discovering the improper disclosures of his private information. (ECF No. 41 at 18.) This is analogous to a slander plaintiff arguing that the harm he suffered was the cost of his slander lawsuit. And the plain text of the statute rejects this theory of recovery. In relevant part, the Privacy Act reads:

> In any suit . . . in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—
> > (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. §552a(g)(4). Basic statutory construction tells us that Congress would have had no need to include (B) if "the costs of the action" were included in the "actual damages" contemplated by (A). Therefore, the costs of the action are not special damages under the Privacy Act, and their increase cannot be the sole pecuniary loss suffered by a Privacy Act plaintiff.

Schneider neither pleaded and proved special damages, nor sufficiently alleged them in his response and reply. As a result, his Privacy Act claim must fail at summary judgment.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 27) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment under Fed. R. Civ. P. 56 (ECF No. 36) is **GRANTED in part** and **DENIED in part**. Summary judgment is granted on Counts I, III, and IV. Summary judgment is denied on Count II.

Dated at Milwaukee, Wisconsin on January 28, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge